**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**PAMELA K. PIRL, et al.,**

       **Plaintiffs,**

    **v.**                    **Civil Action 2:22-cv-3854
Magistrate Judge Jolson**

**EQUINOR USA ONSHORE
PROPERTIES INC.,**

       **Defendant.**

## <u>OPINION & ORDER</u>

This matter is before the Court on the parties' cross-motions for summary judgment. (Docs. 36, 37). For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED** (Doc. 36), and Plaintiffs' Motion for Partial Summary Judgment is **DENIED** (Doc. 37). The Clerk is **DIRECTED** to enter judgment in favor of Defendant.

## I.    BACKGROUND

This case involves a contract dispute over the use of land. Plaintiffs Pamela and Shannon Pirl initiated this lawsuit against Defendant Equinor USA Onshore Properties Inc. ("Equinor") in the Monroe County Court of Common Pleas. (*See* Doc. 1). Defendant then removed the case to federal court. (*Id.*). The parties subsequently consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (Docs. 10, 11).

Pamela Pirl owns about 146 acres of real property in Monroe County, Ohio. (*See* Doc. 31 at 23; Doc. 29-3 at 1). In 2012, Pamela and her husband Joseph Pirl, now deceased, entered into an oil, gas, and coalbed methane lease with Northwood Energy Corporation. (Doc. 31 at 19–20). At some point before June 2014, the lease was assigned to Equinor under its former name, Statoil USA Onshore Properties, Inc. (Doc. 29 at 37; *see also* Doc. 33 at 22).

Under the lease, Equinor and the Pirls then negotiated a Surface Use and Damages Settlement Agreement ("SUA" or "the Agreement") to facilitate Equinor's construction of a well pad. (Doc. 29-3 (the SUA); *see also* Doc. 29-2 at 8 (addendum to Oil and Gas Lease detailing when Equinor needed written approval for the construction of a well pad)). The Pirls' son, Shannon, also participated in the SUA negotiations, but ultimately the SUA made no express mention of him, nor did he sign the agreement. (Doc. 29 at 32–33; 41–42; *see generally* Doc. 29-3).

The SUA provides:

> NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Operator to Surface Owner, the receipt and sufficiency of which are hereby acknowledged, Surface Owner does hereby grant, convey and assign to Operator the exclusive right to build, operate, and maintain a well pad, and appurtenant equipment and facilities (whether above or below the surface) upon the Lands, pipelines to transport gas, condensate, oil and any associated hydrocarbons from the well pad and other lands, temporary above-ground pipelines to transport water to and from the well pad or to other well pads in the area (see below), and the right of ingress and egress across the Lands, temporary storage for equipment that is in transport from one well pad to other well pads and further described and/or depicted, for informational purposes only, on the plat attached hereto as Exhibit "A" and made a part hereof by reference, subject to the following terms and conditions.

(Doc. 29-3 at 1 (defining Joseph R. Pirl and Pamela K. Pirl as "Surface Owner"; defining Statoil USA Onshore Properties, Inc. as "Operator"; defining the Pirls' 146.063-acre tract of land as "the Lands")). A topography plat titled "Surface Use Plans" is attached to the SUA as the above-referenced Exhibit A. (*Id.* at 1, 6). In addition to the 3.2 acre well pad, Exhibit A depicts topsoil stockpiles, filter fabric fence ("SFF") lines, and the existing tree and property lines. (*Id.* at 6). Exhibit A also shows a site-boundary line, or the limit of disturbance ("LD"). (*Id.*).



"Exhibit A"

In relevant part, the SUA also contains the following provisions:

8.      FACILITIES.  Operator shall not drill a well within SEVEN HUNDRED AND FIFTY feet (750') of any DWELLING HOUSE NOW ON THE PREMISES, OR NEARER THAN FIVE HUNDRED (500') FEET OF ANY BUILDING NOW ON THE PREMISES without Surface Owner's written consent. Surface Owner shall not erect any building or structure, or plant any trees within two hundred feet (200') of a well or within twenty-five feet (25') of a gathering line, pipeline, or other surface facility of Operator without Operator's written consent . . . Operator agrees to confer with Surface Owner regarding the location of surface facilities before beginning construction. Operator shall maintain and reclaim all of Operator's well sites, roads, easements and other facilities in accordance with normal industry practices, and shall reclaim all disturbed areas when required by and in accordance with all applicable legal requirements.
***
15.      New fences and relocated fences will be gated and locked and Surface Owner will be provided keys to said locks.

16.      Pad site to be fenced.

17.      Any existing fences, to be relocated, will be done with the approval of Surface Owner in order to protect cattle.

18.      Stock piled top soil will be seeded and mulched to minimize run off.

19.      Reclaimed area will be seeded with a good pasture mix agreed to by

3

Operator and Surface Owner.

20.     At Operators [sic] sole expense, an area of approximately 8 acres of pasture will be fenced off for cattle grazing, said location shall be mutually agreed upon by Surface Owner and Operator but shall not be unreasonably withheld.

21.     In the event above ground pipelines transect areas that are used for cattle grazing, Surface Owner and Operator shall mutually agree upon burying pertinent sections of said pipeline or building a temporary fence around pipelines in order to ensure safety of the cattle.

(Doc. 29-3 at 2–3).

Equinor paid $73,000.00 upon execution of the SUA "for damages occasioned by Operator's use of the surface of the Surface Owner's property for its operations and as compensation for Surface Owner's loss of use, crops, timber or other value occasioned by Operator's use of the surface for the operations described [in the SUA]." (*Id.* at 1, ¶ 2). The amount was calculated by multiplying $5,000 by 14.6 acres, the total limit of disturbance depicted in Exhibit A. (Doc. 31 at 31–32; Doc. 29-3 at 6; *see* Doc. 29-2 at 8 (addendum to the oil and gas lease stating "Lessor will be compensated for the use of [] the surface on a per acre basis at the rate of $5,000.00 per acre utilized")). The finalized SUA was executed on June 25, 2014, and Equinor finished construction of the site in February 2016. (*Id.*; *see* Doc. 29-5). An as-built survey depicts the ultimate coordinates and dimensions of the well pad, the fencing surrounding the pad and installed around the site, and the topsoil stockpile at the southern tip of the plat. (*Id.*). And the final limit of disturbance was 12.0 acres rather than 14.6 acres. (Doc. 35 at 77; Doc. 35-4 at 20 (fence line survey showing "well site limit of disturbance 12.0 acres")).



"As-Built Survey"



"Fence Line Survey"

Yet, all was not well. As relevant here, Joseph Pirl brought concerns to Equinor in October 2016 related to his cattle business. (Doc. 33-2 at 1 (issue number seven), 8; *see* Doc. 31 at 32–33 (describing Joseph Pirl's cattle business)). Specifically, owing to the construction of the topsoil stockpile and surrounding fence, Joseph complained that he did not have a path wide enough at the southern tip of the site to comfortably traverse his tractor and cattle. (*Id.*). Equinor declined to move the fence at that time. (*Id.*).

After Joseph died in July 2018, Pamela sold the cattle she had owned with her husband. (Doc. 31 at 33; *see also* Doc. 29 at 57). The record is unclear as to whether she sold any of her cattle to Shannon. Regardless, at some point between 2018 and 2022, Shannon purchased cattle of his own. (Doc. 29 at 20, 57). Shannon testified that he had "been involved in the cattle business [his] whole life," but it was not until after his father's death that he began operating a cattle business on Pamela's property under his own name. (Doc. 29 at 18, 21–22 (testimony that Shannon's cattle business is not organized as a legal entity), 28–29, 32–33 (Shannon's testimony he "partially" owned the cattle business with his father at the time the SUA was signed)). For her part, Pamela does not have an ownership interest in that business, does not receive profits from the business on a regular basis, and does not receive money from Shannon in exchange for his use of her property. (Doc. 29 at 56–57 (testimony that Shannon previously shared profits from the cattle business with Pamela when "she had gout"); Doc. 31 at 23 (testimony that Pamela and Shannon do not have a written agreement for his use of her land—only a verbal agreement), 32–33; Doc. 36-2 at 7). Nevertheless, in February 2020, Pamela and Shannon revived the request for fencing to be relocated to allow for Shannon's cattle to pass more easily through the site. (Doc. 29 at 83–85).

The parties tried to resolve the dispute on their own but couldn't find a way forward.

6

Plaintiffs then initiated this lawsuit, bringing claims for breach of contract, trespass, and quiet title. (*See* Doc. 3).  Plaintiffs seek compensatory and punitive damages, attorneys' fees and costs, and injunctive relief.  (*Id.* at 11).

On May 6, 2024, Defendant filed a Motion for Summary Judgment seeking an end to the case.  (Doc. 36).  Plaintiffs filed a Motion for Partial Summary Judgment.  (Doc. 37).  They want judgment as a matter of law on their claims but request a trial to determine Shannon's compensatory damages and whether Pamela and Shannon are entitled to punitive damages.  (*Id.*).  Responses and replies were filed all around, and the motions are ready for review.  (Docs. 40, 41, 42, 43).

## II.      STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial "responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record that demonstrate "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Evidence is viewed in the light most favorable to the nonmoving party, meaning that "any direct evidence offered by the [nonmovant] in response to a summary judgment motion must be accepted as true."  *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (citing *Liberty Lobby*, 477 U.S. at 251–52, and *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)).  Ultimately, the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251–52.

III.    DISCISSION

Both sides moved for summary judgment on Plaintiffs' breach of contract, trespass, and quiet title claims. (Docs. 36, 37). Defendant also challenges Shannon's standing to bring all three claims. (Doc. 36 at 25–33). The Court considers the motions concurrently.

A.    Standing

Under Ohio law, "only a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract." *Grant Thornton v. Windsor House, Inc.*, 566 N.E.2d 1220, 1223 (Ohio 1991) (citation omitted). Equinor argues Shannon Pirl does not have standing to pursue any claims under the SUA because he is not a party to the SUA, nor is he an intended third-party beneficiary. (Doc. 36 at 25). Plaintiffs do not dispute that Shannon's name is not listed anywhere in the SUA or that Shannon did not sign the SUA. (Doc. 29-3; Doc. 31 at 22 (Pamela's testimony that Shannon's name is not listed in the SUA); Doc. 36-2 at 6 (admission that Shannon did not sign the SUA); Doc. 36-3 at 7 (same)). Rather, Plaintiffs argue that Shannon is an intended third-party beneficiary under the SUA because he took over his father's cattle business, and the SUA contemplated future cattle operations. (Doc. 41 at 17–18; *see also* Doc. 37-1 at 11).

To determine whether Shannon has standing to pursue claims under the SUA, the Court must decide whether Shannon was an intended third-party beneficiary or an incidental third-party beneficiary. Ohio courts have adopted the Restatement (Second) of Contracts, § 302 in distinguishing between the two types of beneficiaries:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
>> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>>
>> (b) the circumstances indicate that the promisee intends to give the

8

beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850, 855 (6th Cir. 2020) (citing *Hill v. Sonitrol of SW Ohio, Inc.*, 521 N.E.2d 780, 784 (Ohio 1988)).  "Third parties that are only incidental beneficiaries are generally not permitted to assert claims under contracts to which they are not parties."  *Id.* at 856 (citing *Norfolk & W. Co. v. United States*, 641 F.2d 1201, 1208 (6th Cir. 1980)).

In order to find that a third party was an intended beneficiary to an agreement, "there must be evidence that the contract was intended to directly benefit that third party."  *Huff v. FirstEnergy Corp.*, 957 N.E.2d 3, 7 (Ohio 2011); *Norfolk & W. Co.*, 641 F.2d at 1208 ("[T]he mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract was insufficient . . . ."); *see also In re Nat'l Century Fin. Enters., Inc.*, 377 F. App'x 531, 540 (6th Cir. 2010) ("Under Ohio law, for a third-party beneficiary to be an intended beneficiary, the contract must have been entered into by the parties *directly or primarily* for the benefit of that person." (citation and internal quotation marks omitted)); *TRINOVA Corp. v. Pilkington Bros.*, 638 N.E.2d 572, 577 (Ohio 1994) ("There must be evidence that the promisee assumed a duty to the third party.").  The language of the contract is the best measure of the parties' intent in this respect. *In re Nat'l Century Fin. Enters., Inc.*, 377 F. App'x at 540.  "Although there is no requirement that the intended third-party beneficiary be expressly identified in the contract, the contract must be shown to have been made and entered into with the intent to benefit that individual."  *Torrance v. Rom*, 157 N.E.3d 172, 185 (Ohio Ct. App. 2020) (collecting cases).

Here, Plaintiffs argue that Shannon meets the intent-to-benefit test from the Restatement (Second) of Contracts, § 302, and offer three provisions of the SUA as support:

12.    <u>SUCCESSORS</u>.  All rights, duties, and liabilities herein benefit and bind Surface Owner and Operator and their respective heirs, successors and assigns.

\*\*\*

20.     At Operators sole expense, an area of approximately 8 acres of pasture will be fenced off for cattle grazing, said location shall be mutually agreed upon by Surface Owner and Operator but shall not be unreasonably withheld.

21.     In the event above ground pipelines transect areas that are used for cattle grazing, Surface Owner and Operator shall mutually agree upon burying pertinent sections of said pipeline or building a temporary fence around pipelines in order to ensure the safety of the cattle.

(Doc. 37-1 at 12; Doc. 41 at 18.; Doc. 29-3 at 3–4).   Particularly, Plaintiffs contend that the language of paragraphs 20 and 21 "recognized the continuation of the Pirls' cattle business." (Doc. 37-1 at 12; Doc. 41 at 18).   Because Shannon succeeded his father in operating the cattle business, Plaintiffs say that allowing Shannon to enforce the SUA "furthers the parties' intent" that "Equinor's operations would coexist with the Pirls' cattle business." (Doc. 37-1 at 12; Doc. 41 at 18).   They also argue that Pamela and Joseph "wanted the person who continued their cattle business to benefit from the SUA." (Doc. 37-1 at 12; Doc. 41 at 18).

But the SUA is not about a cattle business owner's rights.   In fact, nothing in the plain language of the SUA conferred benefits on Pamela and Joseph as a function of their cattle business. Instead, the SUA defines Pamela and Joseph solely by their property ownership and consistently uses that label throughout.   (Doc. 29-3 at 1 (defining Pamela and Joseph as the "Surface Owner" and stating "Surface Owner is the owner of the surface of a 146.063 acre tract of land"); *see also* Doc. 29-8 at 1 (first amendment to the SUA defining Pamela as the Surface Owner)).

Still, Plaintiffs argue that because the SUA mentions cattle, it "recognized the continuation of the Pirls' cattle business." (Doc. 37-1 at 12).   But again, the SUA never refers to Pamela and Joseph's interest in a cattle business.   All mentions of "cattle" are general, with no indication as to who owns or operates them or if there is a "cattle business" at all.   (*See* Doc. 29-3 at 3–4, ¶¶ 17 (discussing the general protection of cattle), 20 (discussing an area for cattle grazing), 21

10

(discussing areas used for cattle grazing and cattle safety)).  Further, the SUA does not mention Shannon or his current or future interest in the cattle business.  *See Torrance*, 157 N.E.3d at 185 (rejecting an intended beneficiary claim where the contract did not reference the plaintiff or his interest in an LLC).  Simply put, the plain language of the SUA shows its purpose is to benefit the owner of the underlying property, not the owner of the cattle on the land.

What's more, under the four corners of the Agreement, Equinor is never required to pay, confer with, notify, seek permission from, consider, or otherwise interact with the owner of a cattle business.  In fact, the provisions Plaintiffs offer as support expressly provide that Equinor and the Surface Owner—not the cattle owner—must agree before Equinor takes certain actions related to cattle.  (Doc. 29-3 at 3, ¶¶ 20–21).  This is also true of the only other provision that considers livestock.  (*Id.* at ¶ 17 ("Any existing fences, to be relocated, will be done with the approval of the Surface Owner in order to protect cattle.")).  And the other provisions the Pirls negotiated make no mention of cattle.  (*See, e.g.*, *id.* at ¶¶ 15, 16, 18, 19).  So, it would seem that Equinor would not anticipate that it owed any duty to the owner of the cattle business.  *See Pearson v. Ewing*, 2014 WL 718367, at * 7 (Ohio Ct. App. 2014); *see also Huff*, 957 N.E.2d at 7 (holding the general public was not an intended third-party beneficiary when the language "contain[ed] no language establishing an ongoing duty to the general public on behalf of" the defendants).  Though the Surface Owner and the cattle owner were one and the same when the SUA was executed, the SUA's language does not expressly say or imply that anyone other than the Surface Owner is a beneficiary.  It is true that an owner of a cattle business that operates on Pamela's land might benefit from the constraints the SUA places on Equinor, but that benefit is incidental and not intended.

Lastly, Plaintiffs rely on Pamela and Joseph's desire that the "person who continued their

11

cattle business [would] benefit from the SUA."  (Doc. 41 at 18; *see also* Doc. 37-1 at 12; Doc. 42 at 19–20.).  A party's subjective intent does not rule the day.  Rather, "a contract's intent resides in the language the parties chose to use in the agreement."  *Huff*, 957 N.E.2d at 6.  So, Pamela and Joseph's personal intentions behind negotiating the contract are not enough to satisfy the test, and Shannon has no standing to sue under the SUA.

Shannon fares no better with his other claims.  It is undisputed that he does not own the property at issue here.  (Doc. 29 at 29–30 (Shannon's testimony he does not own "the property on which the well pad sits"); Doc. 31 at 23 (Pamela's testimony she is the sole owner of the property); Doc. 36-2 at 16; Doc. 36-3 at 16).  Without a property interest, he lacks standing to assert either a trespass or a quiet title claim.  *See McGlone v. Centrus Energy Corp.*, No. 2:19-CV-02196, 2022 WL 974381, at *19 (S.D. Ohio Mar. 31, 2022) ("Ohio law does not allow for those without property interests to sue for damages to land . . ."); *Abraham v. BP Exploration & Oil, Inc.*, 778 N.E.2d 48, 51 (Ohio Ct. App. 2002) (citing *Rowland v. Rowland*, 8 Ohio 40 (1837)) ("To recover on a claim of trespass, a plaintiff must prove that he or she had actual or constructive possession of the land at the time the trespass occurred."); Ohio Rev. Code § 5303.01 ("An action [to quiet title] may be brought by a person in possession of real property, by himself or tenant, against any person who claims an interest therein adverse to him, for the purpose of determining such adverse interest. Such action may be brought also by a person out of possession, having, or claiming to have, an interest in remainder or reversion in real property . . . ."); *NBRT Properties, Inc. v. ATFH Real Property, LLC*, 2018 WL 6169235, at *5 (Ohio Ct. App.  2018) (citation omitted) ("[W]here a party bringing a quiet title action lacks either possession or a claim of an interest in remainder or reversion, the action cannot be maintained.").

Accordingly, the Court **GRANTS** Defendant summary judgment on this issue, and

Plaintiff Shannon Pirl must be **DISMISSED** from this action.

**B.    Breach of Contract**

Next, the parties seek summary judgment on multiple breaches of contract.  "Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach."  *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (citations omitted).  Once again, ascertaining the intent of the parties is key in determining whether a breach occurred.  *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 875 N.E.2d 561, 566 (Ohio 2007) (citation omitted).  To that end, "[w]here the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract."  *Id.*; *see also Bohlen v. Anadarko E & P Onshore*, L.L.C., 80 N.E.3d 468, 471 (Ohio 2017) ("[T]he unambiguous language of the contract governs and courts 'will not give the contract a construction other than that which the plain language of the contract provides.'" (citation omitted)).  Courts should give common words their ordinary meaning, "unless manifest absurdity results" or another meaning is evidenced from the contract itself.  *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio 1992).

Plaintiff alleges four beaches: (1) when Equinor installed permanent fencing; (2) when Equinor installed fencing outside the LD; (3) when Equinor installed only one topsoil stockpile instead of two; and (4) when Equinor created a rock pile on the topsoil stockpile.  (Doc. 37-1 at 13–14).  Ultimately, the Court finds no breach occurred.

*1.    Exhibit A*

As a threshold matter, the Court must address the plat, "Exhibit A," attached to the SUA. (Doc. 29-3 at 6).  As previously mentioned, the provision of the SUA describing the rights granted, conveyed, and assigned to Equinor cites to Exhibit A:

> NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Operator to Surface Owner, the receipt and sufficiency of which are hereby acknowledged, Surface Owner does hereby grant, convey and assign to Operator the exclusive right to build, operate, and maintain a well pad, and appurtenant equipment and facilities (whether above or below the surface) upon the Lands, pipelines to transport gas, condensate, oil and any associated hydrocarbons from the well pad and other lands, temporary above-ground pipelines to transport water to and from the well pad or to other well pads in the area (see below), and the right of ingress and egress across the Lands, temporary storage for equipment that is in transport from one well pad to other well pads and *further described and/or depicted, for informational purposes only, on the plat attached hereto as Exhibit "A" and made a part hereof by reference*, subject to the following terms and conditions.

(Doc. 29-3 at 1 (emphasis added)).  The parties dispute the legal implication of this provision and of Exhibit A generally.

To begin, the parties fight over Exhibit A's meaning.  Plaintiff says the SUA limits Equinor's operations to exactly as depicted in Exhibit A with respect to the limit of disturbance boundary, fencing, and topsoil stockpiles.  (Doc. 37-1 at 13–14; *see also* Doc. 41 at 7–8; Doc. 41 at 8).  In other words, Exhibit A must bind Equinor.  Equinor responds that, because the SUA labels Exhibit A as "for informational purposes only," the SUA "covers a total of 146.063 acres of the property," and it paid the Pirls to use 14.6 acres of that total.  (Doc. 36 at 19–20; *see also* Doc. 40 at 14–15; Doc. 43 at 4–5).  Equinor's operations need not match Exhibit A exactly.  All that matters is its operations do not exceed 14.6 acres total.  (*Id.*).  And Equinor asserts that it did not exceed 14.6 acres—rather the final limit of disturbance totaled 12.0 acres.  (Doc. 40 at 15; Doc. 35 at 77; 35-4 at 19).

Plaintiff's argument on this point misses the mark.  The SUA defines "the Lands" as the Surface Owner's 146.063-acre tract of land located in Monroe County, Ohio.  (Doc. 29-3 at 1).  The SUA, in exchange for consideration, "grant[ed], convey[ed] and assign[ed] to [Equinor] the exclusive right to build, operate, and maintain a well pad, the appurtenant equipment and facilities

(whether above or below the surface) upon *the Lands*." (*Id.* (emphasis added)).  And the SUA continues to refer to "the Lands" generally in the provisions discussing Equinor's payment for damages, reclamation obligations, liens, and title and interests.  (*Id.* at 1–2, ¶¶ 2, 6, 9).  So, the plain language of the SUA does not restrict these rights to a specific 14.6-acre portion of the 146.063 total acres.

That said, Exhibit A outlines the construction site with a 14.6-acre limit of disturbance. (Doc. 29-3 at 6).  In conjunction with Equinor's damages payment for 14.6 acres, then, Exhibit A by itself could imply that Equinor must operate within that depicted boundary.  (*Id.* at 1).  But interpreting the contract this way ignores the fact that the parties expressly qualified the depictions and descriptions in Exhibit A as "for informational purposes only." (Doc. 29-3 at 1).  Importantly, the Court is unaware of, and Plaintiff does not argue, a meaning of the phrase that differs from its ordinary meaning.  Neither does Plaintiff does argue this phrase is ambiguous.  The adjective "informational" is commonly used to denote something as educational.  *See* https://www.merriam-webster.com/thesaurus/informational (last accessed August 26, 2024).  Therefore, its usage here implies that the purpose of Exhibit A is educational, rather than binding.  Contrast the "for informational purposes only" provision to a provision that states "the parties agree to site construction projects as portrayed in Exhibit A."  Intent to bind the parties to the precise survey exists in the latter but not the former.

Further, the SUA does not otherwise refer to Exhibit A in any other provision or with any other qualifying phrase.  (*See e.g.*, Doc. 29-3 at 3, ¶¶ 15, 18).  It is unclear why the parties would have qualified the descriptions and depictions in Exhibit A as "for informational purposes only" had that phrase been meaningless.  Still more, the language of Exhibit A supports that the depiction represents an idea of what construction could look like rather than a finalized plan.  It expressly

15

allowed for the possibility that unknowns may impact the ultimate construction: "Pad earthwork volumes: *assuming* 12" topsoil, 12,000 CY to be stripped"; "All *proposed elevations are approximate and relative*; pad elevations *may* be field adjusted to balance earthwork"; "Cut slopes required to avoid road encroachment; Geotech analysis required to *confirm feasibility*"; "*If* soils present are not capable of supporting steep slopes, *pad size and location may change*." (Doc. 29-3 at 6 (emphasis added)). And though some aspects of Exhibit A include potential coordinates and measurements, those particulars are notably missing from the depictions of the limit of disturbance, the fencing, and the topsoil stockpiles. (*Id.*). Simply put, Exhibit A does not bind Equinor.

Possibly recognizing the weaknesses in her argument, Plaintiff asserts that if Exhibit A does not bind Equinor, the enforceability of the SUA is called into questioned. (*Id.*). Specifically, she argues "[i]f the parties do not agree on the boundaries for the land to be conveyed or otherwise covered by the agreement then the agreement fails." (*Id.*, citing *Nofzinger v. Blood*, 2003 WL 1464519, at *5 (Ohio Ct. App. 2003)). Plaintiff says that if the Court accepts Equinor's position about the legal impact of Exhibit A, it should grant her leave to amend her Complaint to allege the SUA is not an enforceable contract. (*Id.* at 9).

Plaintiff's hail Mary assertion and her eleventh-hour request that the Court grant her leave to amend her complaint to include this claim are not well taken. While Federal Rule of Civil Procedure 15(a) instructs "that leave to amend shall be freely granted, a party must act with due diligence if it intends to take advantage of the Rule's liberality." *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995) (citation omitted); *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 445 (6th Cir. 2007) (requiring "'some significant showing of prejudice' to deny a motion to amend base solely upon delay" (citation omitted)); *see also* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").

Here, Plaintiff did not move to amend, so much as she requested the Court allow her to amend if it disagreed with her interpretation of Exhibit A.  (Doc. 42 at 8–9).  In other words, her request is conditional—seemingly only applying if the Court were to rule against her on summary judgment.  (Doc. 42 at 9 ("*if* the Court accepts Equinor's reading of the SUA *then* the Court should give [Plaintiff] leave to amend [her] Complaint to allege the SUA is not an enforceable contract." (emphasis added)); *cf. Sandcrest Outpatient Servs. v. Cumberland Cnty. Hosp. Sys., Inc.*, 853 F.2d 1139, 1148–49 (4th Cir. 1988) (affirming denial of motion to amend because amendment would have forced the defendants to alter their litigation strategy and appeared "prompted only by the concern that [the plaintiff] would lose on the summary judgment motion").  And this request comes more than a year past the deadline to amend the pleadings; five months after the close of fact discovery; and only at the last reply brief on the cross-motions for summary judgment.  (*See* Docs. 12, 25, 43).  The Sixth Circuit has held that this timeline generally imposes significant prejudice on opposing parties.  *Prater*, 505 F.3d at 445 (upholding a district court's denial of a motion to amend based on delay and "the late stage of the case when the motion was filed"); *see also Siegner v. Twp. of Salem*, 654 F. App'x 223, 228 (6th Cir. 2016) ("Allowing an amendment after discovery is closed and summary judgment motions are 'fully briefed' imposes significant prejudice on defendants.") (collecting cases).  Such prejudice exists here when allowing Plaintiff to plead that the SUA is an unenforceable contract would, in essence, push this case back to the starting line.  Even more so because Plaintiff has alleged from the beginning that the SUA is a valid contract, which undoubtedly has shaped Defendant's litigation strategy.  (*See* Doc. 3 at ¶ 56; *see also* Doc. 37-1 at 10 ("No one disputes that the SUA is a valid, enforceable contract . . . The only dispute is whether Equinor operated correctly under the SUA.")).

What's more, though Plaintiff contends that it was Equinor's arguments in response to her

partial summary judgment motion that newly "open[s] the door for the Court finding the SUA unenforceable," Equinor's read of Exhibit A is not new. In its Answer, Equinor denied the paragraph of Plaintiff's Complaint that alleged "the SUA contains an exhibit which depicts the survey of the Well Site and its above-ground facilities and appurtenances," and it noted "the SUA provides that the plat attached to the SUA is 'depicted, for informational purposes only.'" (*Compare* Doc. 3 at ¶ 17 *with* Doc. 8 at ¶ 17). Plaintiff does not provide further excuse or justification for her request or why it was not made earlier. *See Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 459 (6th Cir. 2001) ("When amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier."); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 641–42 (6th Cir. 2018). And ultimately significant prejudice would result if the Court allowed her to amend this late in the litigation on the basis that it ruled against her on summary judgment.

Even if justice required allowing Plaintiff to amend her complaint, her "lack of a meeting of the minds" argument fails on the merits. (Doc. 42 at 8). Under Ohio law, "manifestation of mutual assent" is an essential element of a contract. *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (citation and internal quotation marks omitted). "The concepts of 'mutual assent' and 'meeting of the minds' have been used interchangeably." *Advance Sign Grp., LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir. 2013) (citing *Costner Consulting Co. v. U.S. Bancorp*, 960 N.E.2d 1005, 1009–10 (Ohio 2011)). Importantly, "[w]hen there is a written contract, Ohio courts hold that the signing of an agreement and acquiescence in its effect generally demonstrates the existence of a 'meeting of the minds.'" *Stonebridge Operating Co., LLC v. Antero Resources Corp.*, 510 F.Supp.3d 567, 577 (S.D. Ohio 2020) (citation and internal quotation marks omitted).

Here, the SUA, on its plain terms, is a rather straightforward agreement pursuant to the

parties' oil and gas lease. (Doc. 29-3 at 1; *see* Doc. 29-2 at 8 (oil and gas lease addendum)). It contains the requisite essential terms: it identifies Equinor and the Pirls, identifies the underlying property, grants Equinor the right to use all 146.063 acres of that property in a particular way, and provides damages to the Pirls for that use as to 14.6 acres. (Doc. 29-3). An exact survey of those 14.6 acres is not essential for this type of contract. *Cf. Nofzinger*, 2003 WL 1464519, at *5 (holding there was no meeting of the minds when parties disputed boundary lines in a contract to convey real property). Notably, if the depictions in Exhibit A were not attached to the SUA, the Court would still be able to (1) determine the contours of the rights granted to Equinor regarding its use of "the Lands"; and (2) determine if Equinor breached the contract by exceeding the grant or by using more land than it made a damage payment for. *See* 17 Ohio Jur. 3d Contracts § 33 ("While the terms of the contract must be reasonably certain, this condition is met if the terms provide a basis for determining the existence of a breach and for giving an appropriate remedy."). And, at base, Plaintiff signed off on, and has since acted under, the SUA—which qualified Exhibit A as "for informational purposes only." Simply put, Plaintiff cannot get out of a contrary summary judgment ruling by suddenly claiming she should not be held to the promise that she made.

In sum, Plaintiff's argument that Equinor should be held exactly to the descriptions and depictions in Exhibit A is unpersuasive. The plain language of the SUA reveals that the Pirls granted, conveyed, and assigned Equinor rights to build and operate on 146.063 acres of their property. Equinor paid for the right to use 14.6 acres of that property. The inclusion of, and the parties' agreement to, the phrase "for informational purposes only" reveals intent that the depictions and descriptions in Exhibit A were meant to be educational rather than legally binding. Plaintiff's desire to amend her complaint to include a claim that the SUA is not a valid contract on this read of Exhibit A is untimely, prejudicial, and would fail on the merits. Accordingly, to the

extent that Equinor's ultimate construction deviated from the plans in Exhibit A, the Court does not find an automatic breach.

### 2. *Permanent Fencing*

Turning now to Plaintiff's specific assignments of breach. Plaintiff finds issue with Equinor's installation of permanent fencing. She first argues that the SUA allows Equinor to build a fence surrounding the well pad site and the filter fabric fence to protect against erosion only. (Doc. 37-1 at 13). Because of this, under paragraph 8 of the SUA, "Equinor needed to get Pamela's permission for the [permanent] fencing" it built at the limit of disturbance. (*Id.*). Equinor counters that it did not need to seek permission to build the fence because the SUA allows it to build permanent fencing generally and merely requires it to confer with Pamela before beginning construction. (Doc. 40 at 12). The Court agrees with Equinor's interpretation.

To start, the plain language of the SUA does not limit Equinor to certain fences. The SUA "grant[ed], convey[ed] and assign[ed] to [Equinor] the exclusive right to build, operate, and maintain a well pad and appurtenant equipment and facilities (whether above or below the surface) . . . ." (Doc. 29-3 at 1). The parties do not dispute that fencing is a type of "facility" contemplated under the SUA. (Doc. 37-1 at 13 (arguing fencing fits within the ordinary definition of facility); Doc. 40 at 15 (labeling fencing an "appurtenant facility" to the well site)). While true the SUA expressly notes that the "[p]ad site [was] to be fenced" and requires Equinor to fence a pasture, nothing on the face of the SUA limits Equinor to those two fences only. (*See* Doc. 29-3 at 3, ¶¶ 16, 20). And the plain language of the SUA also does not restrict Equinor from building fences that otherwise comply with the SUA. (*See generally id.*).

Further, the SUA considers the Surface Owner's access to any new fences (plural): "New fences and relocated fences will be gated and locked and Surface Owner will be provided keys to

said locks." (*Id.* at 3, ¶ 15). While Plaintiff argues this provision contemplates the pad site fence and the pasture fence at the exclusion of all other fences, she does not support this assertion with any language from the SUA. (*See* Doc. 41 at 9). And, as discussed above, she cannot hold Equinor to building only fences depicted in Exhibit A because Exhibit A was intended by the parties to be "for informational purposes only." (*See* Doc. 37-1 at 4–5). The best she offers is that the parties "never agreed to allow Equinor to fence the entire site" during the negotiations leading to the SUA. (*See* Doc. 41 at 3, citing Doc. 29 at 48–50, 59 and Doc. 31 at 28). But when the contract is unambiguous, as here, "courts are constrained to apply the plain language of the contract" rather than delving into a party's recollection of the contract's negotiations. *St. Marys*, 875 N.E.2d at 566. (*See also* Doc. 29-3 at 3, ¶ 10 (noting the SUA "supersedes any prior oral or written agreements or negotiations as to these matters not set out in writing herein")).

Next, paragraph 8 of the SUA states the "Operator agrees to confer with Surface Owner regarding the location of surface facilities before beginning construction." (Doc. 29-3 at 2, ¶ 8). Notably missing from this provision is a directive that Equinor seek permission from Pamela before constructing fences as Plaintiff alleges. (*Id.*; *cf. id.* at 3, ¶ 17 (requiring permission of the Surface Owner before existing fences are relocated)). The SUA merely requires Equinor to confer with Pamela before installing surface facilities. (Doc. 29-3 at 2, ¶ 8). It gives no further instruction. (*Id.*). As such, Plaintiff's interpretation of the SUA on this matter is incorrect.

Faced with the express terms of the contract, Plaintiff changed her tune in her reply brief. Rather than arguing that Equinor failed to seek her permission to build the fence, Plaintiff now asserts that Equinor cannot show it conferred with her or her husband on the fencing. (Doc. 42 at 2–3). But Equinor offered multiple instances in the record demonstrating that it conferred with Joseph Pirl at least once before it constructed fencing. (Doc. 29 at 76 (testimony that Equinor

21

spoke with Joseph Pirl about building the fence in question before it was built); Doc. 33-1 at 40 (2016 landowner meeting notes discussing Joseph Pirl's concerns about fencing); Doc. 33-4 at 5–6 (2015 email noting that a "landman working for Equinor" spoke to Joseph Pirl about his concerns related to fencing)).  Still, Plaintiff says this is not good enough.  She pushes back on these instances as conferences about different fencing.  (Doc. 42 at 2–3, 5).  She argues that "[a]t best, Equinor can show it conferred with Pirls about temporary fencing on the site, but not about permanent fencing."  (*Id.*; *see* Doc. 29 at 75–77 (Shannon's testimony Equinor talked with Joseph about a "temporary fence" 2016)).  Yet it is unclear why this distinction makes a difference under the SUA.  The SUA does not require a separate procedure if Equinor wished to construct temporary fencing versus permanent fencing.  Nor does the SUA require Equinor to confer with the Surface Owner again if temporary fencing became permanent.  While such conference may have been in the best interest of perpetuating good will between the parties, that is not what the SUA requires.

In sum, the SUA allows Equinor to install permanent fencing, and the SUA does not require that Equinor receive the Surface Owner's permission before it does so.  Therefore, Equinor did not breach the SUA by installing permanent fencing, and the Court **GRANTS** Equinor's summary judgment motion on this issue.

### 3.  Fencing Outside the Limit of Disturbance in Exhibit A

Plaintiff also contends that Equinor violated the SUA when it installed portions of the outer fence "outside the limit of disturbance" as depicted in Exhibit A.  (Doc. 37-1 at 14).  Equinor challenges this claim both on the grounds that Plaintiff did not raise this issue in the Complaint and on the merits.  (Doc. 40 at 9–10, 14–16; Doc. 43 at 3).

There is valid question as to the pleading issue.  In her Complaint, Plaintiff alleges that Equinor placed fencing not displayed in Exhibit A "outside the SFF line, at about the line depicting

the limits of disturbance," and that Equinor constructed two fences that were "outside of what was permitted by [the SUA]." (Doc. 3 at 5, ¶¶ 26, 32). Even when read together, these sentences may not be enough to provide Equinor with notice of the grounds on which this breach of contract claim rests—that the breach is due to the fence's location "outside of the limit of disturbance." *See Arnold v. Alphatec Spine, Inc.*, No. 1:13-CV-714, 2014 WL 2896838, at *3 (S.D. Ohio June 26, 2014) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)) ("The purpose of the 'short and plain statement' requirement is to '*give the defendant fair notice* of what the ... claim is and the grounds upon which it rests.'" (emphasis in original)).

But regardless, this claim fails on the merits. As discussed above, the SUA did not limit Equinor's operation to the limit of disturbance as depicted in Exhibit A. The descriptions and depictions in Exhibit A were "for informational purposes only." As long as Equinor operated within a 14.6-acre area on the Pirls' property, it complied with the terms of the SUA. True, the record reflects that portions of a fence "appear[ed]" to be located outside of the final 12.0-acre limit of disturbance, and the final fencing does not match what was depicted in Exhibit A. (Doc. 35 at 77–82 (testimony of Equinor employee Bret Dockter); Doc. 35-4 at 19–20 (fencing survey); Doc. 35-5 at 1–2 (email from an Equinor consultant that fencing was installed "outside" the "well site boundary" as depicted in the SUA)). But Plaintiff has not provided evidence that Equinor's operations exceeded the 14.6 acres Equinor made a damages payment for. Considering the Court's preceding conclusion that Equinor could install fencing under the plain language of the SUA, Equinor's installation of fencing here is not a breach of the SUA. Therefore, the Court **GRANTS** Equinor summary judgment on this issue.

### 4.   *Number of Topsoil Stockpiles*

Plaintiff next alleges a breach because "Equinor unilaterally reduced the [two] topsoil stockpiles to one stockpile" without receiving permission from the Pirls.  (Doc. 37-1 at 14).  She argues that Exhibit A represented the parties' agreement to have two stockpiles rather than one. (*Id.*).  But, as the Court previously discussed, the fact that Exhibit A depicts two topsoil stockpiles and Equinor installed only one does not constitute a breach of contract by itself.  Exhibit A was intended by the parties to be "for informational purposes only."

Further, the SUA granted, conveyed, and assigned Equinor the right to build, operate, and maintain a well pad and appurtenant equipment and facilities.  (Doc. 29-3 at 1).  Maintaining a topsoil stockpile falls into this inclusive grant, especially considering Equinor's duty under the SUA to reclaim the property.  (*See* Doc. 29-3 at 1 (requiring Equinor to reclaim the property in accordance with all applicable laws and regulations at the termination of the SUA); *see also* Doc. 35 at 47 (testimony that the purpose of a topsoil stockpile is to keep topsoil available for reclamation efforts), 89–90 (testimony that Equinor is "obligated to maintain" a topsoil stockpile by the Ohio Department of Natural Resources)).  As for the stockpile itself, the SUA requires that Equinor seed and mulch "[s]tock piled top soil . . . to minimize runoff."  (Doc. 29-3 at 3, ¶ 18). But it is silent as to the number of stockpiles Equinor must construct.  Accordingly, Equinor was not required to seek a written and approved amendment from Plaintiff prior to installing one topsoil stockpile rather than two.  (*See* Doc. 29-3 at 3, ¶ 13 (SUA procedure on agreement modification)). Therefore, the Court **GRANTS** summary judgment in Equinor's favor on this claim.

### 5.   *Storage of Rocks on Topsoil Stockpiles*

Plaintiff lastly argues Equinor breached the SUA when it "unilaterally created a rock pile within the topsoil stockpile."  (Doc. 37-1 at 14).  Like her previous arguments, Plaintiff contends

24

that nothing in the SUA permitted Equinor to store rocks on the topsoil stockpile, and the SUA required Equinor to seek her permission for the rocks in advance. (*Id.*). Equinor again challenges this assertion both on the grounds that Plaintiff did not raise this issue in the Complaint and on the merits. (Doc. 40 at 9; Doc. 43 at 3).

As to the former, the Court does not agree. Plaintiff's Complaint alleges that "Defendant did not separately stockpile topsoil, and instead mixed the topsoil with other non-topsoil materials in violation of the SUA." (Doc. 1-1 at ¶ 53). The Court finds that this allegation puts Equinor on notice of Plaintiff's claim. Though Plaintiff did not specifically state the non-topsoil materials included rocks and those rocks were stored on top of the stockpile, she was not required to include this level of specificity in her Complaint. *See* Fed. R. Civ. P. 8(a)(2) (requiring only a "short and plain statement of the claim showing that the pleader is entitled to relief"); *see Arnold v. Alphatec Spine, Inc.*, No. 1:13-CV-714, 2014 WL 2896838, at *3 (S.D. Ohio June 26, 2014) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)) ("The purpose of the 'short and plain statement' requirement is to '*give the defendant fair notice* of what the . . . claim is and the grounds upon which it rests.'" (emphasis in original)).

Nonetheless, Plaintiff's allegation is without merit. Once again, the rights granted, conveyed, and assigned to Equinor allowed it to build, operate, and maintain a well pad. (Doc. 29-3 at 1). The SUA does not limit Equinor from storing rocks on the stockpile—it only requires that it be seeded and mulched to minimize runoff. (Doc. 29-3 at 3, ¶ 18; *see also* Doc. 35 at 50–51 (testimony that the rocks on the stockpile help to minimize runoff because they provide stability to the soil)). Accordingly, Equinor did not have to get Plaintiff's permission to store rocks on the topsoil stockpile. The Court **GRANTS** summary judgment in Equinor's favor on this claim as well.

### C.    Trespass

Next, the parties present cross-motions for summary judgment as to Plaintiff's trespass claims.  "A common-law tort in trespass upon real property occurs when a person, without authority or privilege, physically invades or unlawfully enters the private premises of another whereby damages directly ensue."  *Apel v. Katz*, 697 N.E.2d 600, 607 (Ohio 1998).  "There are two elements to trespass: '(1) an unauthorized intentional act, and (2) entry upon land in the possession of another.'"  *Little Hocking Water Ass'n, Inc. v. E.I. du Pont Nemours and Co.*, 91 F.Supp.3d 940, 978 (S.D. Ohio 2015) (citing *Brown v. Scioto Cty. Bd. of Commrs.*, 622 N.E.2d 1153, 1161 (Ohio 1993)).  If a party is authorized by contract to enter onto land in possession of another, the trespass claim fails as to the first element.  *See Beavers v. PNC Bank, Natl. Assn.*, 2013 WL 6408727, at *4 (Ohio Ct. App. 2013).

Plaintiff's trespass claim rests on the assumption that "the SUA did not authorize Equinor's fencing at or outside the LD and the rock pile."  (Doc. 37-1 at 16–17).  And because these actions fell outside the confines of the contract, they constitute trespass.  (*Id.*, citing *Stand. Oil Co. v. Keller*, 27 N.E.2d 785, 785 (Ohio Ct. App. 1939)).  But the Court concluded that all three of Equinor's actions forming the basis of this claim were allowed under the SUA.  Therefore, Plaintiff has failed to establish the first element of trespass.  Accordingly, there is no need to consider the parties' arguments about the statute of limitations or the alleged type of trespass, and the Court **GRANTS** summary judgment to Defendant on this claim.

### D.    Quiet Title

Finally, the parties both seek summary judgment on Plaintiff's quiet title claim.  Under Ohio law, an action for quiet title is a statutory cause of action that "may be brought by a person in possession of real property, by himself or tenant, against any person who claims an interest

26

therein adverse to him, for the purpose of determining such adverse interest." Ohio Rev. Code § 5303.01. "The purpose of any quiet-title action is to conclusively determine the allocation of property interests." *Ochsenbine v. Cadiz*, 853 N.E.2d 314, 317 (Ohio Ct. App. 2005) (citations omitted). Plaintiff again premises this claim on issues already discussed: "Equinor cannot maintain the fence at the LD. As a result, the Court should quiet title to all portions of the Real Estate outside the 3.2-acre pad site and say that Equinor cannot maintain the fence at the LD." (Doc. 37-1 at 16). Plaintiff asks for an injunction against Equinor, and a Court order to remove "the fence at the LD because it is the only way to restore [Plaintiff's] use of the Real Estate outside the 3.2-acre pad site." (*Id.*). However, because the Court concluded that Equinor did not breach the SUA by installing a fence at the LD, Plaintiff's arguments fail. Accordingly, the Court **GRANTS** Equinor summary judgment on this claim as well.

***

In sum, the Court concludes that Equinor did not breach the SUA. Plaintiff's claims for breach of contract, trespass, and quiet title must fail. And ultimately, Shannon Pirl lacks standing to bring any of these claims. Because of these conclusions, it is not necessary to consider either Pamela or Shannon's arguments related to damages.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Motion for Partial Summary Judgment is **DENIED**. The Clerk is **DIRECTED** to enter judgment in favor of Defendant.


Date: August 26, 2024                    /s/ Kimberly A. Jolson
                                         KIMBERLY A. JOLSON
                                         UNITED STATES MAGISTRATE JUDGE